**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                  **Criminal Case No.: 1:22-CR-11-2**
                                                  **(JUDGE KLEEH)**

**RICO CRAWFORD,**
                **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS, [ECF NO. 130], BE DENIED**

Pending before the undersigned Magistrate Judge is Defendant Rico Crawford's Motion to Suppress Physical Evidence, [ECF No. 130]. By Order dated March 28, 2022, [ECF No. 133], United States District Judge Thomas S. Kleeh referred the motion to the undersigned to enter a report and recommendation as to disposition of the motion.

The undersigned is also in receipt of the Government's Response to Defendant's Motion, [ECF No. 138], and Defendant's Reply, [ECF No. 152]. The undersigned conducted a hearing on the suppression motion on April 18, 2022, at which time the Court heard witness testimony, accepted exhibits into evidence, and heard the argument of counsel for both parties.

Based on a detailed review of Defendant's Motion, [ECF No. 130], Government's Response, [ECF No. 138], Defendant's Reply, [ECF No. 152], the exhibits introduced, the testimony provided, and oral arguments offered, the undersigned **RECOMMENDS** Defendant's Motion to Suppress Physical Evidence, [ECF No. 130], be **DENIED** as set forth herein.

## I. FACTUAL BACKGROUND

In March 2021, the Mon. Metro Drug Task Force ("MMDTF") obtained search warrants[1] to place a GPS monitoring device on a rental vehicle, a black Toyota 4Runner, and to do a GPS monitoring and a pen register trap and trace on a cellular telephone. Both the 4Runner and the phone were believed to be used by a drug-traffic organization as means for transporting narcotics from Michigan to West Virginia. The 4Runner had previously been observed being driven by Defendant Rico Crawford from Detroit, Michigan to Morgantown, West Virginia. The cell phone had previously been contacted by MMDTF undercover officers, and a controlled purchase was arranged and executed based upon that communication.

On the evening of April 6, 2021, MMDTF Sergeant Ryan Gillespie observed through GPS monitoring that the subject 4Runner and cell phone had moved around the Detroit area then embarked on a trip in the direction of Morgantown, West Virginia. Sgt. Gillespie notified the Monongalia County Sheriff's Department that the 4Runner was traveling to Morgantown. He provided information about the rental vehicle and requested that deputies conduct a traffic stop on the 4Runner if they could find probable cause to do so. Sgt. Gillespie also notified the Morgantown Police Department's canine handler, Officer Breakiron, of the incoming 4Runner and advised that assistance of a canine might be required.

At approximately 1:28 a.m. on April 7, 2021, Deputy King and Deputy Matlick of the Monongalia County Sheriff's Department parked their cruisers near the rest area on Interstate I-79 near mile marker 159. Deputy King parked closer to the interstate, while Deputy Matlick parked in the parking lot of the rest area. Around 1:58 a.m., Deputy King observed the 4Runner pass on

---

[1] The undersigned's previous authorization of a search warrant does not preclude him from considering this Motion to Suppress. *See* Compendium § 3.6-8(f), Committee on the Code of Conduct for United States Judges, ("Facts of a proceeding solely obtained by a judge in his or her judicial capacity are not personal knowledge resulting in disqualification under Canon 3C(1)(a).").

the interstate and commit the traffic violation of following too closely behind another vehicle. Deputy King drove onto the interstate behind the 4Runner and further observed the 4Runner drive on or over the right white line. Deputy King turned on his emergency lights to initiate the traffic stop. Deputy Matlick followed behind to assist. The rental vehicle pulled over; the deputies pulled over, exited their cruisers, and approached the vehicle.

Deputy King identified the driver of the vehicle as Rico Crawford; Deputy Matlick identified the front-seat passenger[2] of the vehicle as Addonis Moore. Deputy King advised Crawford that "the reason I stopped you is you're following too close to that car and you were on the white line as I came up behind you."

Moore only had a temporary paper ID, so Matlick attempted to get secondary information to confirm Moore's identify. Moore, however, did not have his wallet with him. Matlick observed the smell of marijuana when speaking to Moore.

Crawford advised deputies that the two were traveling from Michigan to Morgantown to pick up a friend who lived at the Lofts in Morgantown, West Virginia. Crawford stated to King they were picking up his nephew, Moore stated to Matlick they were in town to pickup his cousin, but when later asked by deputies, Moore and Crawford stated that they were not related.

Deputy King returned to his cruiser to run Crawford's information through dispatch. Dispatch advised that Crawford's license had been "cancelled." Deputy King returned to speak to Crawford about the status of his license. Deputy Matlick informed Deputy King that he observed

---

[2] The undersigned would note passengers generally have no reasonable expectation of privacy in regard to items found in another's vehicle. *See* United States v. Carter, 300 F.3d 415, 421 (4th Cir. 2002) ("A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object."); United States v. Rusher, 966 F.2d 868, 874–75 (4th Cir. 1992) (vehicle passengers cannot contest vehicle search).

the odor of marijuana in the vehicle while speaking to Moore and advised that Moore was breathing hard and seemed nervous. Deputy King then personally observed Moore being nervous including "his chest moving up and down from rapid breathing."

Based upon the odor of marijuana, nervousness of passenger Moore, and the inconsistencies within Crawford and Moore's stories, deputies called for a canine to conduct a free air sniff around the vehicle. Deputies noted that because Crawford's license was "cancelled" they did not know if he was allowed to drive or not, and Moore had a temporary paper ID but no wallet to further verify his identity. Deputies asked for an ETA on the canine and were told he was nearby at the 155-mile marker. Sgt. Alexander of the Mon. County Sheriff's Department arrived on the scene of the traffic stop shortly thereafter.

Officer Breakiron and his canine Rusty from the Morgantown Police Department arrived on scene at 2:13 a.m. Matlick told Moore and Crawford,

> Since there is a slight odor of marijuana, your stories aren't really both acting up, I mean, making sense, we do have a canine here, he's gonna search the vehicle. Okay, we're gonna pull you guys out one at a time, we're gonna do a quick patdown to make sure there's no weapons. Before we get to that point, is there any weapons on you? 'Cause I'm gonna take you out first. Okay. And then you'll be taken out second, okay? Then the canine is gonna go around and then we'll go from there. If that's all it was, was a little bit o' weed earlier today and we can't find anything, we'll just give you guys a warning and send you down the road. Okay?

Crawford and Moore were asked to step out of the vehicle, were placed into handcuffs, and instructed to move away from the 4Runner. Officer Breakiron and his canine Rusty walked around the perimeter of the 4Runner and performed the free air sniff. Canine Rusty crawled under the vehicle, and her breathing and sniffing changed; she laid down, with her head pointed up – a positive indication for the presence of narcotics.

Deputies read Crawford and Moore their Miranda Rights; both stated that they understood their rights. Deputy King advised them that the canine had alerted on the vehicle and that deputies

would be searching the vehicle. Both Moore and Crawford stated that there was nothing illegal in the vehicle. Crawford advised the only thing that officers "might" find was "weed" left in the vehicle from earlier.

A search of the vehicle yielded two vacuum-sealed clear plastic bags of a crystal rock-like substance, methamphetamine totaling 684 grams, and a sealed bag containing a white powdery substance, fentanyl totaling 68 grams. The substances were located under the air filter in the air filter container of the engine compartment.

## II. PROCEDURAL BACKGROUND

On February 15, 2022, a Grand Jury returned a multi-count, multi-defendant indictment which accused Defendant Rico Crawford ("Crawford") in Count One with Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, in Count Six with Aiding and Abetting Distribution of Heroin, in violation of Title 18, United Stated Code, Section 2 and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C), in Count Ten with Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(A), in Count Eleven with Possession with Intent to Distribute Fentanyl, in violation of Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C), and in Count Twelve with Aiding and Abetting Possession with Intent to Distribute Heroin, in violation of Title 18, United Stated Code, Section 2 and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C),

In his Motion to Suppress, filed on March 27, 2022, Defendant Crawford first argues that deputies violated his Fourth Amendment rights because the deputies lacked reasonable suspicion to make the traffic stop of Crawford's vehicle. Specifically, Defendant Crawford asserts that "[t]he traffic stop was unquestionably pretextual" based upon the GPS monitoring tracking the activity of the vehicle in the hours preceding the traffic stop and the "complete absence of detail" in the

deputies' description of the alleged traffic violation. [ECF No. 130 at 5-7]. Defendant Crawford secondly argues that deputies violated his Fourth Amendment rights by "unlawfully and unnecessarily extending the traffic stop and seizure in order to conduct a search beyond the scope of the seizure." [ECF No. 130 at 7]. Defendant Crawford contends that deputies exceeding the scope and tolerable duration necessary to satisfy the conditions of an investigative seizure by prolonging the stop to conduct a K9 sniff after deputies observed the smell of marijuana and by extending the search to include a search under the hood of the vehicle including the disassembly of engine parts.

In its Response, the Government argues that the vehicle Defendant Crawford was driving was lawfully stopped for a traffic violation. Moreover, Government asserts that as soon as the officer spoke with the occupants of the vehicle and smelled marijuana, there was probable cause to search the vehicle, but following the positive alert by the K9, the officers had further developed probable cause to search the vehicle.

In his Reply, Defendant argues that where a traffic stop was highly susceptible to human errors, merely conclusory statements, lacking the necessary indicia of reliability to be an objectively reasonable basis for probable cause as to initiate a traffic stop, the traffic stop should be deemed unlawful, and the exclusion of evidence is warranted. [ECF No. 152 at 2-3 (citing United States v. Sowards, 690 F.3d 583 (4th Cir. 2012))]. Defendant further argues that the dog sniff and alert do not justify extending scope and duration of seizure in time or beyond the passenger compartment. [Id. at 4-5].

## II. SUMMARY OF TESTIMONY AND EVIDENCE

During the aforementioned suppression hearing on April 18, 2022, the Court heard sworn testimony from four witnesses: Sgt. Ryan Gillespie of the West Virginia Police Department, Cadet John Matlick of the Pennsylvania State Police Department, formerly of the Mon. County Sheriff's

Department, Officer Zane Breakiron of the Morgantown Police Department, and Deputy Sheriff Carnell King of the Mon. County Sheriff's Department. The Court also heard oral argument from the parties.

At the suppression hearing, the Court received into evidence the following: (1) Government's Exhibit No. 1,[3] Body Camera Footage of Former Patrol Deputy John Matlick; (2) Government's Exhibit No. 2,[4] Body Camera Footage of Mon. County Deputy Sheriff Carnell King; (3) Defendant's Exhibit No. 1, Primary Report by Deputy Carnell King, [ECF No. 159-1]; and (4) Defendant's Exhibit No. 2, , [ECF No. 159-2].

**A. Testimony of Sergeant Ryan Gillespie**

The Government first called Sergeant Ryan Gillespie ("Sgt. Gillespie") of the West Virginia University Police Department to testify. [11:00:35-11:00:55].[5] Sgt. Gillespie testified that he has been assigned to the Mon. Metro Drug Task Force ("MMDTF") since June of 2019. [11:01:13-11:01:32; 11:18:40-11:19:10]. In late 2020, Gillespie became involved in a MMDTF narcotics investigation involving a drug trafficking organization from Detroit, Michigan including Donovan Swift and William Trice. [11:01:33-11:02:03].

On March 15, 2021, the MMDTF identified a cell phone, phone number 681-867-8702, as a phone used by the drug trafficking organization as a means of distributing narcotics. [11:02:06-11:02:59]. MMDTF confidential informants made contact with the organization using that phone number in order to arrange a purchase of narcotics. [11:03:00-11:03:19]. MMDTF undercover

---

[3] A copy of Government's Exhibits 1 and 2 were provided to the Clerk's Office on CD-ROMs to be archived in the case file.
[4] *See Id.*
[5] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on April 18, 2022, which is located on the section of the Court's intranet site for FTR recordings.

officers were also purchasing controlled substances, which field tested positive as heroin and fentanyl, from the organization. [11:03:20-11:03:42].

As a result of the investigation, on March 17, 2021, Sgt. Gillespie sought and obtained a search warrant for the cell phone to perform a pen register trap and trace and get GPS tracking data from the cell phone.[6] [11:03:42-11:04:39]. Once GPS tracking was enabled on the cell phone, MMDTF officers could learn the location, or ping radius of the phone, which would let officers know the general area where the cell phone is located.  A ping radius can be as narrow as locating the phone within a 7-meter radius to up to a 5000-meter radius. [11:04:40-11:05:27].

MMDTF officers also identified a Toyota 4Runner, a registered rental vehicle, as being used by the drug trafficking organization. Specifically, on March 4, 2021, a member of the drug trafficking organization used the 4Runner to meet a confidential source and conduct a drug transaction. MMDTF undercover officers purchased a substance, later field tested as fentanyl, from that source. [11:05:28-11:06:32].

On March 31, 2021, a search warrant was sought and obtained for thirty (30) days of GPS tracking on the 4Runner; a GPS monitor was subsequently placed on the vehicle while it was located at a Residence Inn in Morgantown, West Virginia.[7] [11:06:33-11:07:27].

On April 6, 2021, Gillespie observed, through GPS monitoring, that both the cell phone and the Toyota 4Runner were at an address associated with Rico Crawford in Canton, Michigan. [11:07:28-11:08:30]. Gillespie monitored the vehicle throughout the day as it moved towards Meldrum St. in Detroit, Michigan then began moving in unison with the target cell phone south on Interstate 275 South. The vehicle and the cell phone then moved south from Michigan, through Ohio and Pennsylvania, towards West Virginia. [11:08:31-11:09:47].

---

[6] *See supra* n. 1.
[7] *Id.*

Gillespie observed the movements via a GPS monitoring application on his cell phone. [11:06:31-11:17:21]. In the evening on April 6, 2021, Gillespie made a determination that the 4Runner and target cell phone were en route to West Virginia. Gillespie believed the individuals associated with the drug trafficking organization, and with the related 4Runner and cell phone, were traveling from Meldrum St. in Detroit, Michigan to West Virginia to sells drugs in bulk in West Virginia. Gillespie went into his office to continue monitoring GPS and to communicate with other agencies about the incoming vehicle and the possibility of a coordinated traffic stop. [11:09:48-11:10:13; 11:17:22-11:18:39].

Gillespie called Mon. County Sheriff's Deputy Carnell King in order to setup a coordinated traffic stop in Monongalia County, West Virginia. Gillespie explained that a "coordinated traffic stop" occurs when the drug task force provides information to local law enforcement with jurisdiction about a vehicle the MMDTF has interest in, such as the 4Runner with GPS tracking in this case, and asks that local law enforcement finds probable cause to stop the vehicle if possible. [11:10:38-11:11:30]. Gillespie also contacted the Morgantown Police Department to inform them that a traffic stop may occur where a canine and canine handler would be needed. [11:11:30-11:11:50; 11:12:15-11:12:37].

Gillespie explained that coordinated traffic stops are often executed as part of a federal "fentanyl protocol" policy where, based upon the dangers associated with fentanyl, drug task forces should do everything in their power to take such drugs off the street. The MMDTF wanted to perform a coordinate traffic stop on this 4Runner, in execution of the fentanyl protocols, to avoid the introduction of more fentanyl into West Virginia. [11:12:38-11:13:07; 11:14:31-11:15:34]. On cross examination, Gillespie testified that he does not believe the fentanyl protocol causes officers to be more aggressive or push the limits regarding probable cause; Gillespie further

testified he would recognize ordinary parameters for probable cause a traffic stop. [11:15:34-11:16:05].

The coordinated traffic stop in this case occurred at approximately 1:58 a.m. shortly after the 4Runner crossed over into Monongalia County, West Virginia. [11:11:51-11:12:15]. Gillespie was not on the scene for the April 7, 2021 traffic stop, but he did monitor the movements of both the 4Runner and the cellphone on April 6 and 7, 2021. [11:16:06-11:06:30].

### B. Testimony of Cadet, former Patrol Deputy, John Matlick

The Government next called Cadet John Howard Matlick of the Pennsylvania State Police to testify. [11:26:36-11:27:22]. Matlick will be a Pennsylvania State Trooper starting in May 2022; Matlick previously served as a Patrol Deputy for the Mon. County Sheriff's Department for eight and a half years. [11:27:42-11:28:25].

On April 7, 2021, Matlick was working night shift, 11:00 pm to 7:00 am, for the Mon. County Sheriff's Department. [11:28:26-11:28:45]. On that date, the Mon. County Sheriff's Department was notified by the MMDTF that the MMDTF wanted surveillance to conducted because a black Toyota 4Runner SUV would likely be traveling down I-79 into Monongalia County, West Virginia. [11:28:46-11:29:48]. Matlick was in his marked police vehicle, which did not have an in-car camera or recording capability. Matlick was, however, wearing a body camera which he started when he began to assist with the traffic stop.[8] [11:29:49-11:30:23; 12:02:21-12:03:09; 12:06:10-12:06:39].

Deputies Matlick and King parked their vehicles near the rest stop near mile marker 158 on I-79. Matlick was parked in the parking lot of the rest area. King was parked nearer to the interstate. The Toyota 4Runner was observed by Deputy King who initiated the traffic stop.

---

[8] *See* Government's Exhibit No. 1, Body Camera Footage of Former Patrol Deputy John Matlick.

[11:30:24-11:31:32; 11:59:52-12:00:59; 12:01:20-12:01:46; 12:01:05-12:02:20]. King had not been in a position on the interstate shoulder which would have caused drivers to switch lanes based upon the presence of an emergency vehicle. [12:06:39-12:07:27]. King later told Matlick that the 4Runner was following too closely and crossed the fog line on the side. Matlick did not personally observe the traffic violations because he was not in the same position to observe as Deputy King was. [12:03:10-12:04:05].

After the 4Runner was stopped, Matlick went to assist because this was the vehicle they were warned about. [11:31:33-11:31:59]. Matlick, with emergency lights on, pulled in and parked his vehicle behind King on the shoulder of the interstate, and approached the passenger side to begin speaking with the passenger, Addonis Moore. [11:32:00-11:32:22; 11:36:20-11:36:24].

Quick into the traffic stop, after he began speaking with Moore, Matlick smelled marijuana. Neither man denied the smell of marijuana. [11:39:49-11:40:18]. Matlick told the other officers to turn down their radios, explaining that he didn't want the passenger or driving to know he was about to call in a canine sniff request. [11:41:49-11:42:02].

 Matlick explained that Moore and Crawford were calm until asked about the odor of marijuana. Matlick testified that Moore began to breath "super hard," his chest was raising and falling, and he became nervous. [11:43:16-11:44:01; 12:04:05-12:04:52]. Matlick could not recall if Crawford was nervous or similar behavior. [12:04:52-12:05:15].

Officer Breakiron, the canine officer with the Morgantown Police Department, soon arrived on scene to perform a free air sniff. [11:53:01-11:53:09]. Matlick recalls making a statement along the lines of "If that's all it was, was a little bit o' weed earlier today, or we can't find anything, we'll just give you guys a warning and send you down the road. Okay?" [12:05:30-12:06:10].

For the rest of the traffic stop, Matlick's job was to safeguard Moore and Crawford who had been asked to step outside the vehicle and then handcuffed. The reason for him watching or safeguarding Moore and Crawford was to ensure the men did not destroy evidence or cause risk to themselves or others while standing on the shoulder of the interstate. At some point, Sgt. Alexander joined the traffic stop. [12:01:00-12:01:05]. Officer Breakiron went to 4Runner with the canine and, eventually, other officers on scene conducted the search of the 4Runner. [11:58:26-11:59:15].

### C.  Testimony of Officer Zane Breakiron

The Government next called Canine Handler Officer Zane Breakiron of the Morgantown Police Department to testify. [12:15:50-12:16:24]. Breakiron has been with the Morgantown Police Department for five years and ten months and has been a canine handler for approximately a year and a half. [12:16:25-12:16:47; 12:17:44-12:17:48; 12:23:31-12:23:39]. Breakiron's canine partner is a female English pointer named Rusty. [12:16:48-12:16:53; 12:17:33-12:17:37]. Rusty is certified, and she gets recertified every year. Breakiron and Rusty do routine training every other week. [12:16:54-12:17:10]. Rusty is specifically trained to detect narcotics substances. [12:17:11-12:17:17]. Rusty alerts after smelling narcotics substances by laying down, sitting, or pointing. [12:17:18-12:17:32; 12:17:37-12:17:44; 12:25:00-12:25:19].

On April 6, 2021, Breakiron was advised by MMDTF that canine assistance may be required in late evening of April 6, 2021 or early morning of April 7. 2021. [12:17:49-12:18:13]. Breakiron was in Morgantown, West Virginia, near Grafton Road, when he got the call at 2:04 a.m. requesting canine assistance. [12:18:14-12:18:50].

Breakiron and Rusty arrived on the scene of the traffic stop around 2:13 a.m. [12:18:51-12:19:42]. Breakiron communicated with the law enforcement officers on scene and spoke with Deputy King as to why he stopped the vehicle. [12:19:44-12:19:56]. Breakiron requested that all

occupants exit the vehicle. Breakiron ran Rusty around perimeter of 4Runner to detect for the presence of controlled substances. [12:19:57-12:20:29]. Rusty alerted to the presence of an odor by crawling underneath and laying down under the 4Runner. When she did so she, she laid perfectly still, had her head looking up, and her breathing and sniffing changed to notify a positive alert. [12:20:30-12:20:55; 12:22:17-12:22:48]. Breakiron communicated with other law enforcement officers on scene that there was a positive alert for narcotics. [12:20:56-12:21:09].

A search was conducted on the vehicle, and Breakiron participated in the search. [12:21:10-12:21:29]. Narcotics were eventually located in air filter in engine compartment. [12:21:30-12:21:40]. Breakiron testified that the location of the narcotics discovered explained to him why Rusty alerted the way she did by going under vehicle to get as close to the odor as she could. Breakiron explained Rusty could likely smell the controlled substances from underneath because the vehicle was running and blowing air out from the engine compartment, but Rusty's indication could have meant narcotics were anywhere in the vehicle. [12:21:41-12:22:16; 12:25:34-12:27:17].

On cross-examination, Breakiron testified that documentation regarding his and Rusty's qualifications, certifications, weekly trainings, and veterinarian records are within the possession of the Morgantown Police Department. Officer Breakiron further testified that if presented with a subpoena *duces tecum,* he would be able to provide said documentation at trial. [12:23:40-12:24:02; 12:24:03-12:24:53].

Breakiron further testified that Rusty does not alert to the odor of marijuana and the odor of marijuana would not influence Rusty's alert to the presence of narcotics. [12:27:18-12:27:51].

### D.  Testimony of Deputy Carnell King

The Government next called Deputy Carnell King of the Mon. County Sheriff's Department to testify. [12:29:20-12:29:48]. On April 6, 2021, King was working the midnight shift

in his marked vehicle. [12:29:49-12:30:09]. The vehicle did not have in-vehicle camera or recording capability, but King was wearing a camera that night which captured what he observed when interacting with targets.[9] [12:30:10-12:31:08].

During his shift, King was advised that assistance may be required by the MMDTF to stop a vehicle, a Black Toyota 4-Runner with Virginia plates, which was expected to be traveling from Michigan south on I-79 towards Morgantown. [12:31:30-12:32:32].

King positioned his vehicle on the ramp exiting the rest stop and entering back onto I-79. [12:32:33-12:33:00]. Deputy Matlick also parked nearby in rest area while King was closest to interstate. [12:33:23-12:34:03].

Approximately thirty minutes later, Deputy King noticed the 4Runner drive by on I-79. [12:33:00-12:33:22; 12:34:04-12:34:11]. King pulled out behind the vehicle because he had observed the 4Runner following too closely behind vehicle in front of it. The 4Runner was following too closely such that if the vehicle in front of it would have rapidly stopped, the 4Runner would have had difficulty stopping without hitting the vehicle in front. [12:34:38-12:35:00; 1:40:12-1:40:26]. There was not a lot of traffic out that night and no reason why the 4Runner should have been following the front vehicle that closely. [12:35:01-12:35:07]. King believed this to be a traffic violation under West Virginia Code § 17C-7-10.[10] [12:35:08-12:35:40; 1:37:58-1:39:03].

On cross-examination, King was unable to describe the make or model of the vehicle in front of the 4Runner, but reiterated that in his opinion, if the first vehicle would have stopped

---

[9] See Government's Exhibit Number 2, Body Camera Footage of Mon. County Deputy Sheriff Carnell King.
[10] W. Va. Code § 17C-7-10 provides that "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

abruptly, the 4Runner would have struck the vehicle in front of it. [1:36:09-1:37:57]. King could not recall the speed at which the 4Runner was travelling or how close the 4Runner was in feet or yards to the vehicle in front of it. [1:39:28-1:40:12].

As soon as King pulled out and got behind the 4Runner, it also crossed white line on the right side of the interstate. [12:34:12-12:34:37; 12:35:40-12:35:48; 1:39:03-1:39:21]. King believed this to be a traffic violation, a failure to obey traffic control devices, West Virginia Code § 17C-3-4.[11] [12:36:49-12:38:04]. King often watches for traffic infractions such as this while on night shift, often caused by impaired driving. [12:36:00-12:36:48].

After observing the two traffic violations, King initiated the traffic stop by turning on his cruiser's emergency lights. [12:35:49-12:35:59; 12:38:05-12:38:14]. King advised dispatch of the traffic stop. [12:38:15-12:38:23]. King turned on his body camera as he was getting out of the car. King then approached the driver's side of the 4Runner. Matlick approached the passenger side. [12:38:24-12:30:03; 1:42:45-1:42:39]. King did not smell marijuana on the driver's side, but Matlick observed the smell of marijuana from his position on the passenger's side. [1:42:40-1:43:55]. Shift Manager Deputy Alexander joined the traffic stop at some point thereafter. [1:50:06-1:50:22].

King observed Breakiron run the dog around the vehicle, which was running at the time, and observed the dog go under the vehicle. [1:01:45-1:03:50]. Breakiron reported the positive alert to the deputies, and then Breakiron, Deputy King, and Sgt. Alexander searched the vehicle. [1:11:40-1:11:55]. King stated on cross-examination that if Rusty has not alerted, he believed there

---

[11] W. Va. Code § 17C-3-4 provides that "The driver of any vehicle and the operator of any streetcar shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with the provisions of this chapter, unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this chapter."

would not have been a further search, but ultimately, that decision would have been up to his superior officer, Deputy Alexander. [1:46:55-1:47:15; 1:50:22-1:50:49].

During the search of the vehicle, King searched extensively, including trying to find and open "trap doors" or hidden compartments the vehicle. [1:09:30-1:09:34]. The vehicle was on when Breakiron and Rusty were performing the sniff of the vehicle; King turned the car off during the search of the vehicle. [1:09:35-1:09:55]. King noted the smell of marijuana was even stronger in the passenger compartment. [1:44:15-1:44:50]. The search began on the interior passenger compartment and was quite a thorough search. [1:48:13-1:49:21]. Seventeen or eighteen minutes into the search, officers began to search the exterior and under the hood of the vehicle. [1:49:22-1:50:06].

Narcotics were eventually recovered from the air filter container of the vehicle. [1:30:46-1:31:01]. No marijuana was ever recovered from the 4Runner. [1:44:51-1:45:21]. The clear substance recovered was speculated to be 684 grams of methamphetamine or "ice" based upon its appearance. The 68-gram package was believed to be heroin. There was no field testing of the substances. [1:34:05-1:35:07]. After the drug were seized, they would have been temporarily placed in a locked storage container at Mon County Sheriff's Department. [1:31:02-1:31:18]. King was not involved in submitting the substances to a laboratory, but he believes the substances were submitted to a laboratory for further testing. [1:35:29-1:35:51].

King ultimately did not write any traffic citations for Crawford for the traffic violations of following too closely or for failure to obey traffic control devices. [1:39:22-1:39:28]. King testified on cross examination that it is very common for him to initiate traffic stops on vehicles who cross over the white line, especially on midnight shift, but he rarely issues citations as a result of traffic

stops. [1:40:21-1:41:44; 1:50:50-1:51:02-1:51:16]. Deputy King wrote a narrative report,[12] dated April 11, 2021, summarizing the events of the traffic stop. [1:32:39-1:34:05].

### E. Oral Argument

At the hearing, counsel for the parties provided oral argument as to the motion to suppress.

Counsel for the Defendant again argued that this case is like the case United States v. Sowards, 690 F.3d 583 (4th Cir. 2012) because Deputy King's observations lack reliability as to support an objectively reasonable basis for probable cause to initiate a traffic stop. Counsel for the Defendant urged suppression of physical evidence is warranted here.

Counsel for the Government argued that Deputy King was justified from the inception to initiate the traffic stop as he personally observed traffic violations and had information regarding the 4Runner's involvement in a drug trafficking organization. Counsel for the Government noted that throughout the body camera footage Deputy King consistently reports to other officers and to Moore and Crawford that the reason he pulled over the 4Runner was because the vehicle was following too closely behind another vehicle and because the 4Runner crossed over the white line.

Counsel for the Government argued that law enforcement had probable cause to search the vehicle as soon as the odor of marijuana was observed. Counsel for the Government argued that law enforcement further established probable cause to search the vehicle once the dog alerted as to the presence of controlled substances. Counsel for the Government asserted that once probable cause was established to search the vehicle, law enforcement officers were able to lawfully search anywhere within the vehicle. Counsel for the Government further argued that the request for the canine sniff did not extend the search considering the driver Crawford's license was reported back

---

[12] See Defendant's Exhibit No. 1, Primary Report by Deputy Carnell King, [ECF No. 159-1].

as "cancelled" and until that issue was resolved, he would have been unable to leave the traffic stop regardless.

### III. APPLICABLE LAW

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Further, longstanding caselaw provides that "[s]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A law enforcement officer is permitted to stop a vehicle when the officer observes a vehicle violating a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (stating a traffic stop is reasonable at the outset "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

Also well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### IV. LEGAL ISSUES AND ANALYSIS

The issues before the Court are (1) whether the traffic stop of Defendant's vehicle was lawful; (2) whether deputies lawfully extended the traffic stop to conduct a canine sniff, and

whether officers had probable cause to search the vehicle and (3) whether deputies' actions were reasonable in scope for their search of the vehicle for controlled substances.

**(1) The undersigned finds that Deputy King's traffic stop of the 4Runner was legitimate from the outset and lawful based upon observed traffic violations.**

A police officer stopping an automobile is a seizure. Such a stop must arise from the officer's probable cause, if not at least reasonable suspicion, to do so. Under longstanding precedent, there is a two-pronged inquiry for the Court here: (1) whether, at the outset, law enforcement's action was legitimate, and (2) whether law enforcement's activities during the stop are reasonably related to the stop. *See* Terry v. Ohio, 392 U.S. 1 (1968); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011); United States v. Vaughn, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017).

The Supreme Court has established that law enforcement's stop of an automobile is reasonable if the officer has probable cause that there has been a traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996). "When an officer observes a traffic offense—however minor— he has probable cause to stop the driver of the vehicle." United States v. Hassan El, 5 F.3d 726, 729 (4th Cir. 1993); *See also* United States v. Junkins, No. 2:18-CR-30, 2019 WL 2283921, at *3 (N.D.W. Va. May 29, 2019) (Bailey, J.) (A "traffic stop is reasonable based upon the officer's observation of the defendant's traffic offense"), *aff'd*, 860 F. App'x 297 (4th Cir. 2021); United States v. Cervi, No. 5:15-CR-40, 2015 WL 13735783, at *4 (N.D.W. Va. July 29, 2015) (Seibert, J.), *report and recommendation adopted*, No. 5:15-CR-40, 2015 WL 5598420 (N.D.W. Va. Sept. 21, 2015). "[I]f a traffic stop is objectively justified ... the officer's motive, whether pretextual or not, will not render the stop illegal." Hassan, 5 F.3d at 729–31. *See also* United States v. Jeffus, 22 F.3d 554 (4th Cir.1994); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir.1992) ("Any ulterior motive [that] a police officer may have for making the traffic stop is irrelevant.").

The undersigned notes that in the plethora of caselaw surrounding traffic stops, there is some confusion about the applicable standard – probable cause or reasonable suspicion – for such police activity, depending on the facts at hand. To be clear though, in this case, the undersigned finds that Deputy King had probable cause to initiate the traffic stop, and as such, also met the less-stringent reasonable suspicion threshold.

In United States v. Sowards, 690 F.3d 583, 588 (4th Cir. 2012), the Fourth Circuit considered whether a deputy had reasonably trustworthy information sufficient to support a prudent person's belief that the driver was speeding and, thus, whether there was probable cause to justify the traffic stop. In Sowards, rather than using radar gun or pacing techniques, the deputy guessed the speed of the vehicle in miles-per-hour without considering the distance or time passed. Sowards, 690 F.3d at 589. In his testimony, the deputy noted his difficulties with measurements and conceded he relied on a visual estimate, or guess, of speed alone. Id.

Despite Defendant's arguments, the present case is easily distinguished from Sowards. In Sowards, the Fourth Circuit held that the deputy's conclusion, based on nothing more than guesswork, that a vehicle was traveling in slight excess of the legal speed limit was insufficient to justify a traffic stop. Sowards, 690 F.3d at 593. Extensive case law supports that an officer's visual speed estimate requires additional indicia of reliability to support probable cause. Id. Additionally, there were a myriad of reasons to discredit the deputies' testimony in Sowards. Id.

Here, speeding, which requires additional indicia of reliability, is not alleged to have occurred. The traffic violations observed by Deputy King where that of following too closely behind another vehicle and crossing over the right white line. The "naked eye" can discern if a car drove over the right white line or if a vehicle is dangerously close to the vehicle in front of it. Sowards, 690 F.3d at 592.

Deputy King personally observed the 4Runner commit the traffic violation of following too closely. In his testimony, King cited concerns, based on the close distance between the two vehicles, that if the vehicle in front of the 4Runner were to have rapidly stopped, an accident would have occurred. The undersigned would note that even if Deputy King were mistaken as to the distance between the two vehicles, this mistake of fact likely would not undermine his finding of probable cause if the mistake was reasonable and, especially, where Deputy King observed the 4Runner commit a second traffic violation. *See* United States v. Mubdi, 691 F.3d 334, 342 (4th Cir. 2012), *cert. granted, vacated on other grounds*, 570 U.S. 913, 133 S. Ct. 2851, 186 L. Ed. 2d 902 (2013) (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003)("[i]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable. Great deference is given to the judgment of trained law enforcement officers[.]").

The second traffic violation of failure to obey traffic controls by crossing over the right white line was observed by Deputy King and then, he turned on his emergency lights to initiate the traffic stop shortly after 1:58 a.m. Deputy King testified that this is a common traffic violation in the early morning hours, is often indicative of impaired driving, and he frequently initiates traffic stops for such behavior.

The undersigned finds no reason to discredit Deputy King's account of the traffic violations. On the body camera footage, Deputy King repeatedly, consistently explains to other officers and to Crawford and Moore why he initiated the traffic stop – based upon the violations of following too closely and crossing over the white line. King testified to the same during the April 18, 2022, hearing.

21

In sum, the undersigned **FINDS** that the traffic stop was justified at the inception based upon the traffic violations observed by Deputy King. The undersigned further **FINDS**, for the forgoing reasons, that law enforcement's activities during the stop were reasonably related to the stop and to the investigation of information obtained during the stop.

**(2) The undersigned finds that law enforcement obtained probable cause to search the vehicle and extending the traffic stop to await a drug dog's arrival was reasonable and created minimal intrusion.**

A drug dog's sniff of a vehicle does not require a warrant because it is not a "search" for purposes of the Fourth Amendment. Illinois v. Caballes, 543 U.S. 405, 409 (2005). The use of dog sniffs as an investigative tool is "*sui generis*" or unique under the Fourth Amendment. Id. at 408–09. When a trained dog "alerts" to the presence of narcotics, this fact alone constitutes "probable cause" to search the vehicle. *See e.g.,* Illinois v. Caballes, 543 U.S. 405, 409-410 (2005); United States v. Palmer, 820 F.3d 640, 650 (4th Cir. 2016); and United States v. Jeffus, 22 F.3d 554, 556-557 (4th Cir. 1994) (use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search).

Law enforcement may detain a vehicle while awaiting a drug dog's arrival and sniff, but the detention must be reasonable, with officers using "diligence in pursuing their investigation" and minimizing intrusion upon the suspect. United States v. McBride, 676 F.3d 385, 395 (4th Cir. 2012) (fifty-five-minute detention of vehicle in parking lot while awaiting arrival of drug dog was not unreasonable as officers were diligent in their active investigation). *See also* United States v. White, 42 F.3d 457, 460 (8th Cir.1994) (eighty-minute wait for canine narcotics unit was reasonable); United States v. Yang, 345 F.3d 650, 653–54 (8th Cir.2003) (allowing for a more extended detention once defendant was allowed to drive to a more secure location). *But see* United

States v. Place, 462 U.S. 696, 710, 103 S. Ct. 2637, 2646, 77 L. Ed. 2d 110 (1983) (ninety-minute detention of passenger and luggage unreasonable seizure).

The Fourth Circuit has repeatedly held that an officer's detection of the odor of marijuana establishes probable cause to search a vehicle. United States v. White, 836 F.3d 437, 441-442 (4th Cir. 2016), *abrogated on other grounds by* United States v. Stitt, 139 S. Ct. 399, 202 L. Ed. 2d 364 (2018)(probable cause to search vehicle based on odor of marijuana); United States v. Lewis, 606 F.3d 193, 198 (4th Cir. 2010) (same); United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004). Further, the smell of marijuana provides "reasonable suspicion to extend [a] traffic stop for a period of time sufficient to investigate the marijuana odor." White, 836 F.3d at 442.

Here, deputies had probable cause to search the 4Runner based upon Deputy Matlick's observation of the smell of marijuana. Deputies further obtained probable cause to search the vehicle based upon canine Rusty's alert to the presence of narcotics.

While deputies awaited the drug dog's arrival, they were also awaiting details regarding the cancellation of that driver Crawford's license. Approximately ten minutes elapsed between the initiation of the traffic stop and the arrival of the Officer Breakiron and canine Rusty. Any length of time added to the traffic stop to await the arrival of the canine was minimal, especially where officers were diligently and simultaneously obtaining other information related to the traffic stop and investigation – information verifying Crawford's license cancellation, information verifying Moore's identity and licensure to drive, and information related to the odor of marijuana.

The undersigned **FINDS** that the law enforcement had probable cause to search the 4Runner based upon Deputy Matlick's observation of the odor of marijuana and the nervous behavior of passenger Moore. The undersigned further **FINDS** canine Rusty's alert to the presence of narcotics provided additional probable cause to search the vehicle and any delay caused by

awaiting the presence of the trained narcotics dog was minimal where officers were simultaneously, diligently pursuing their investigation of the traffic stop and the odor of marijuana.

**(3) The undersigned finds that because the officers had probable cause, officers could lawfully search every compartment of the 4Runner, including searching under the vehicle's hood.**

Under the "automobile exception," warrantless searches are permissible under the Fourth Amendment if a vehicle is "readily mobile" and if probable cause exists to believe it contains contraband or evidence of a crime. *See, e.g.*, Maryland v. Dyson, 527 U.S. 465, 466 (1999); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); United States v. Alston, 941 F.3d 132, 138-40 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1221 (2020).

Notably, where law enforcement has probable cause, "the automobile exception permits 'the search of *every part* of the vehicle ... that may conceal the object of the search.'" Alston, 941 F.3d at 138, (quoting United States v. Ross, 456 U.S. 798, 825 (1982) (emphasis added). *See also* United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 196)(approving warrantless search of a vehicle's "secret compartments").

Here, the automobile exception applied because the 4Runner was a readily mobile vehicle and probable cause existed to search the vehicle based upon Deputy Matlick's observation of the odor of marijuana, the nervous behavior of passenger Moore, and canine Rusty's alert to the presence of narcotics. Because the officers had probable cause, they were permitted to extend the search beyond the passenger compartment into other areas of the vehicle. This is particularly true where the canine's alert pointed underneath the vehicle. The undersigned **FINDS** that law enforcement's extensive search of the 4Runner was permissible as officers had established probable cause.

24

## IV. CONCLUSION

Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence, [ECF No. 130], be **DENIED.**

Any party shall have **fourteen (14) days** from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted April 25, 2022.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE